UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

CIVIL ACTION NO. 3:06CV-159-H

REV. RICHARD Z. MILLER and                                                    PLAINTIFFS
LARRY E. NEWBY

V.

FREEDOM WAFFLES, INC., d/b/a
                                                                              DEFENDANTS
WAFFLE HOUSE and

MARK WALLING and

UNKNOWN DEFENDANTS (EMPLOYEES
OF WAFFLE HOUSE)

## MEMORANDUM OPINION

Plaintiffs are two African-American men who allege racial discrimination during their attempt to obtain breakfast at a greater Louisville-area Waffle House restaurant in June 2005. The two men did not receive the service that they expected and an argument ensued. Now they allege violation of 42 U.S.C. § 1981, violation of K.R.S. § 344.120, violation of K.R.S. § 344.280, assault, and slander. Sections 344.120 and 344.280 are both provisions of the Kentucky Civil Rights Act ("KCRA"). Defendants Freedom Waffles Inc. and Mark Walling have moved for summary judgment.

I.

Plaintiff, Rev. Richard Z. Miller ("Miller"), is the pastor of Spirit of Peace Missionary Baptist Church. Plaintiff, Larry E. Newby ("Newby"), is a deacon *pro tem* at the same church. Freedom Waffles is a franchisee of Waffle House restaurants in Louisville. Mark Walling

("Walling"), who is white, is the former president of Freedom Waffles, which operates the restaurant at issue here.  There is little disagreement about the relevant facts.

On the morning of Saturday, June 18, 2005, Miller and Newby (collectively the "Plaintiffs"), who were traveling to a church retreat, stopped at the Waffle House at Exit 121 off I-65 in Brooks, Kentucky.  The restaurant was crowded and busy.  Miller and Newby took a booth near the grill area.  Within about five minutes a waitress, Susan Link, asked for their order.  Miller asked Ms. Link if he could speak to a cook about his order.  She responded that she would convey his order to the cook.  Miller then placed his order, indicating that he wanted his eggs "scrambled soft" and his grits "without lumps."  Miller also stated that he wanted his order served on a "to-go plate" and that he wanted plastic utensils sealed in a plastic bag.  Miller apparently regularly requests this presentation out of his personal concerns about the sanitary standards at Waffle House.  Newby placed a more typical order.

Shortly thereafter, Ms. Link returned with both orders.  Newby's order was prepared to his specifications, but Miller felt that his scrambled eggs were "hard" and his grits "lumpy."  Miller did not taste any of the food but instead observed these characteristics from the food's appearance.  He told Ms. Link that he had wanted to speak with the cook to prevent this very problem.  He also says that he received his food on a regular Waffle House plate, instead of a "to-go" plate.  After Miller made his displeasure known, Ms. Link apparently removed Miller's plate and deposited its contents in a garbage can.

Thereafter, an argument erupted between Ms. Link and Plaintiffs.  This argument drew the attention of a cook, Scott Link, who was Ms. Link's son.  Scott Link then approached the Plaintiffs, apparently while holding a spatula, and said something to the effect of "Don't talk to

my waitress like that." Tempers apparently rose on both sides. Newby said something to the effect of "You don't talk to my pastor like that." Scott Link responded with something to the effect of "I don't care who he is." Newby was particularly upset by the incident and Miller eventually escorted him out of the restaurant.

There is some disagreement about the details of this initial incident. Plaintiffs allege that Ms. Link spilled eggs and grits on Miller in the course of removing his plate. Plaintiffs also allege that Scott Link held the spatula in a "threatening manner" and balled up his fist at Plaintiffs. Newby also alleges that Scott Link used the profanity "damn" in his comments to Plaintiffs; Miller does not remember this word being used. However, all parties agree that no racial epithets were exchanged during the incident, nor was there any physical contact between Miller and Newby on the one hand and Scott Link on the other.

After leaving the Brooks Waffle House, Plaintiffs continued on their way and stopped for breakfast again at another Waffle House in Elizabethtown, Kentucky, also operated by Freedom Waffles. They had a satisfactory experience at this restaurant. At this restaurant, Miller noticed a toll-free customer complaint hotline was displayed. Miller called this number to register a complaint about the incident and request an apology. Some time elapsed. Miller evidently received a call from a company representative who became defensive about the incident and failed to apologize for it.

Through a series of events that is not entirely clear to the Court, a meeting occurred sometime in late August or early September 2005 between Walling, Miller, Newby, Freedom Waffles' General Manager Doug Finnesand, and Reverend Charles Elliot. No attorney for Walling or Freedom Waffles was apparently present. After discussing the incident, Walling

apparently offered a donation to Miller's church to end this entire matter. No money changed hands. A few weeks later, in a letter dated September 26, 2005, Defendants' counsel directed Plaintiffs to immediately cease and desist from any further contact with Walling. The letter also suggested that Plaintiffs share its contents with legal counsel. Plaintiffs filed this action in March 2006.

II.

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Wilkins v. Jakeway*, 183 F.3d 528, 532 (6th Cir. 1999). If "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting Fed. R. Civ. P. 56(e)).

III.

Plaintiffs' first claim is under 42 U.S.C. § 1981. Section 1981 prohibits intentional race discrimination in the making and enforcing of contract with both private and public actors. 42 U.S.C. § 1981(a). There is no direct evidence of racial discrimination in this case. To analyze Section 1981 claims relying on circumstantial evidence of racial discrimination, the Sixth Circuit has adopted the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973). *See Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999). Under this framework, a plaintiff must first establish a prima facie case of discrimination from the circumstantial evidence. *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d


862, 868 (6th Cir. 2001). The burden of production then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions. *Id.* To prevail, the plaintiff must then prove by a preponderance of the evidence that the defendant's proffered reason is not its true reason but a pretext for discrimination. *Id.* Under Sixth Circuit law, to establish a prima facie case of discrimination under Section 1981, a plaintiff must prove:

> (1) plaintiff is a member of a protected class;
>
> (2) plaintiff sought to make or enforce a contract for services ordinarily provided by the defendant; and
>
> (3) plaintiff was denied the right to enter into or enjoy the benefits or privileges of the contractual relationship in that
> > (a) plaintiff was deprived of services while similarly situated persons outside the protected class were not and/or
> > (b) plaintiff received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory.

*Id.* at 872.

The first prong presents little difficulty. As African-Americans, Plaintiffs are certainly members of a protected class. *See, e.g., id.* at 874.

A.

Second, plaintiffs undoubtedly sought to make a contract for services provided by Freedom Waffles – i.e. paying for Freedom Waffles to serve them food. The question whether the services Plaintiffs sought were those that Freedom Waffles "ordinarily provided" is a more difficult question. In Waffle House restaurants, as in most restaurants, customers ordinarily place their orders with a waiter or waitress, who in turn conveys the order to the cooks. It is also customary in Waffle Houses to serve patrons who are "dining in" on regular "china" plates with metal cutlery, while those customers who want their orders "to-go" are served on some type of

plastic, disposable plate with a sealed packet containing plastic cutlery.  Miller here undoubtedly made at least two requests outside those "ordinarily provided":  he requested to place his order directly with the cook (or at least provide additional instructions to him) and he requested than his "dine-in" meal be served in a "to-go" fashion.  The Court therefore concludes that as to these services, Miller sought something beyond those "ordinarily provided" and thus cannot satisfy the second prong of the *Christian* test.[1]  On the other hand, if Plaintiffs claim discrimination regarding the actual food preparation, those individual requests could be deemed "ordinarily provided."  That is to say, many customers express their preferences in how their food should be prepared, and Waffle House undoubtedly honors many such requests each year.  In any event, the Court will also address all of Plaintiffs' claims under the remaining prong of the burden-shifting framework.

B.

The third prong of the *Christian* test is divided into two sub-prongs.  The Court will examine each in turn.  First, a plaintiff can show that he or she was deprived of services while similarly situated persons outside the protected class were not.  *Id.* at 872.  Newby's order was apparently entirely correct.  Miller's order was served with "to-go" cutlery and apparently was otherwise correct beyond his complaint that the eggs were hard, the grits were runny, and the entire meal was served on a regular plate instead of a "to-go" plate.  Plaintiffs would have to convince a jury that the portion of Miller's order that was incorrectly prepared was motivated by racial bias, even though the remainder of Miller's order and all of Newby's order were prepared

---

[1] There would seem to be a practical reason for such a requirement.  If a request is unusual or out of the ordinary, one can never know whether the denial of it was the normal response or due to a discriminatory animus.  Absent direct indications of discriminatory animus, there would be no evidentiary basis to suggest the latter.

according to their specifications.  Under the *Christian* test, the Court finds no evidence from which a rational trier of fact could reach such a conclusion.

The fundamental stumbling block for Plaintiffs on this part of their case is that they advance no evidence showing that similarly situated persons outside of the protected class were treated differently.  There is no evidence that Ms. Link allowed others of different races to make their orders directly with the cook on a busy Saturday morning or at any time.  That type of showing may be difficult, but the *Christian* standard is clear.  Without evidence showing that persons outside a protected class placed an unusual food order and had it satisfied, or that persons outside the protected class placed their unusual food order directly with the cook and had it satisfied, there is insufficient evidence from which to draw an inference that Ms. Link's conduct was, in fact, an act of discrimination.

The second part of the third prong of the *Christian* test creates more evidentiary difficulty.  This prong asks whether the plaintiff received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory.  *Id.* at 872.  Under this prong a plaintiff must show that he or she was treated in an objectively discriminatory manner on account of his or her race.  The evidence here is simply too thin to support a rational trier of fact's conclusion that the service Plaintiffs received was inferior because of their race.  Even if Scott Link directed profanity at Plaintiffs (as Newby asserts), there is insufficient evidence to conclude that the actual service Miller and Newby received was "markedly hostile" or that the profanity was based upon a racial animus.

Numerous district courts have examined cases under this sub-prong and have found that far more serious examples of racially charged conduct – usually including racial epithets – are

required to establish a prima facie case under *Christian. See, e.g., Unroe v. Board of Education Rock Hill Local School,* No. 1:040CV-00181, 2006 WL 22081 at *16 (S.D. Ohio Jan. 4, 2006) (denying summary judgment for defendants where defendant's employee said "I don't want them kind around here"); *Airbrush Express, Inc. v. Jefferson Mall Co., L.P.*, No. Civ. A. 03-691-C, 2005 WL 1567324 at *1, *6 (W.D. Ky. June 30, 2005) (denying summary judgment for defendants in part where defendant's assistant manager indicated that plaintiff's booth in mall attracted too many "African-American" or "African" clients); *Leach v. Heyman*, 233 F.Supp.2d 906 (N.D. Ohio 2002) (denying summary judgment for defendants where defendant cashier called African-American patron "nigger," threatened to "kick his ass," physically assaulted patron, and tried to push patron out of store). Our case falls short in all criteria of analysis.

     Plaintiffs apparently became engaged in a dispute with Susan and Scott Link at Waffle House, a dispute no patron would expect to have with their server. However, this Court can "envision many circumstances where markedly hostile treatment, even in a purportedly service-oriented industry, would raise no inference of racial animus, but rather it would simply be yet another example of the decline of civility." *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 102 (2d Cir. 2001). Section 1981 is not a code of civility for the restaurant industry, but a section of the law prohibiting discrimination based on race. At bottom, this is a dispute about the liquidity of scrambled eggs and the texture of grits, both of which involve fairly subjective and individual judgments. Events spun out of control from there. On our facts, it seems improbable that Plaintiffs were denied any customary services or that race had anything to do with the drama unfolding in the Waffle House that morning. The Court cannot find sufficient evidence to support an inference of racial animus. The Court therefore concludes that Plaintiffs' claim under

8

42 U.S.C. § 1981 cannot survive summary judgment and will be dismissed.

II.

Plaintiffs make several state law claims. First, they claim under K.R.S. § 344.120 which states that "it is an unlawful practice . . . to deny an individual the full and equal enjoyment of the goods, services, facilities . . . of a place of public accommodation . . . on the ground of . . . race." Defendants argue that the K.R.S. § 344.120 claim should be analyzed via the same framework as the Section 1981 claim. *See Camara v. Schwan's Food Mfg., Inc.*, Case No. 04-121, 2005 WL 1950142 (E.D. Ky. Aug 15, 2005) (noting similarity in standards between KCRA and Section 1981 claims). Plaintiffs have not argued to the contrary, and the Court is unable to find any precedent that would dictate otherwise. Therefore, Plaintiffs' state law claims under K.R.S. § 344.120 will be dismissed.

Plaintiffs also claim that Defendants violated section 344.280(5).[2] However, that section by its own language restricts its application to certain sections of the Kentucky Civil Rights Act. Among those is not K.R.S. § 344.120, the section of the KCRA under which Plaintiffs make their pendent state law claims. Thus, it is wrong for counsel to suggest that a cause of action under section 344.280(5) lies under these facts.

Plaintiffs also claim that Defendants "retaliated" against them for complaining about the

---

[2] K.R.S. § 344.280 provides in part:

It shall be an unlawful practice for a person, or for two (2) or more persons to conspire:
(1) To retaliate or discriminate in any manner against a person because he has opposed a practice declared unlawful by this chapter
. . .
(5) To coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by K.R.S. 344.360, 344.367, 344.370, 344.380, or 344.680.

9

incident at the Brooks Waffle House by sending a strongly worded letter dated September 26, 2005 from Defendant's counsel to Plaintiffs. Plaintiffs simply fail to state a claim on this count. Although Plaintiffs may felt threatened or intimidated by the letter from Defendant's counsel, the letter certainly does not constitute "retaliation" or "discrimination" as those terms are used in section 344.280(1). Retaliation claims under the KCRA are interpreted the same way as Title VII retaliation claims. *Mountain Clay, Inc. v. Comm'n on Human Rights*, 830 S.W.2d 395, 396 (Ky. Ct. App. 1992). In order to establish a prima facie case of retaliation, a plaintiff must demonstrate that (1) he engaged in a protected activity under Title VII, (2) defendant knew about the exercise of her rights, (3) she suffered an adverse employment action, and (4) a causal connection between the protected activity and the adverse employment action. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). Clearly, Plaintiffs here did not sustain an "adverse employment action" of any type, and therefore fail altogether to state a claim under K.R.S. § 344.280(1). For these reasons, Plaintiff's claim under section 344.280(1) will be dismissed.

Plaintiffs next claim that Scott Link assaulted them during the course of the incident at the Brooks Waffle House. Scott Link is not a defendant in this action. Because of this fact, even if Scott Link could be found to have assaulted the Plaintiffs in the course of the Brooks Waffle House incident, Freedom Waffles and Walling cannot be held liable under the theory of *respondeat superior*. *Kiser v. Neumann Co. Contractors, Inc.*, 426 S.W.2d 935, 937-38 (Ky. 1967) ("In circumstances under which the liability of the employer is purely derivative, he cannot be held liable while the employee at the same time is found not liable.") Therefore, Plaintiffs' claim of assault against Freedom Waffles and Walling will be dismissed.

### III.

Finally, Plaintiffs assert that Defendant Mark Walling slandered Miller "by accusing him [Miller] of trying to shake him [Walling] down." Plaintiffs allege that Walling slandered Miller by accusing him of extortion in conversations with Doug Finnesand, and possibly in conversations with other individuals as well. The Court, in its discretion, may decline to hear pendent state claims when all federal claims have been dismissed prior to trial. *United Mine Workers v. Gibbs*, 383 U.S. 715, 725-26 (1966); *J.P. v. DeSanti*, 653 F.2d 1080, 1086 (6th Cir. 1981). Judicial economy, convenience, and fairness to litigants are the most commonly cited justifications for exercising pendent jurisdiction. *Id.* With the federal claims dismissed in this case, those justifications have evaporated. If Plaintiffs wish to pursue their state law assault claim against Scott Link or their state law slander claim against Mark Walling, the appropriate forum to do so is state court. Therefore all claims against all defendants will be dismissed, including those claims against Unknown Defendants.

The Court will enter an order consistent with this Memorandum Opinion.

cc: Counsel of Record